1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11  In the Matter of the        )  Case No. 07-MJ-0177-JMA
    Extradition of              )
12                              )  **(1) ORDER GRANTING IN PART AND**
    ALDO OMAR CROTTE SAINEZ     )  **DENYING IN PART REQUEST FOR**
13                              )  **EXTRADITION;**
                                )
14                              )  **(2) ORDER DENYING MOTION TO**
                                )  **STRIKE TESTIMONY OF RUBEN**
15  _____ )  **GONZALEZ AT EXTRADITION**
                                   **HEARING [Doc. No. 26]; AND**
16
17                                 **(3) CERTIFICATION OF**
                                   **EXTRADITABILITY**
18

19       This is a proceeding under 18 U.S.C. § 3184 pursuant to a

20  request by the United Mexican States (hereafter "Mexico") through

21  the United States Government (hereafter "the Government") for the

22  extradition from the United States to Mexico of Aldo Omar Crotte

23  Sainez (hereafter "Crotte" or "Respondent") under the provisions

24  of the Extradition Treaty Between the United States of America

25  and The United Mexican States, May 4, 1978 (hereafter "Treaty").

26       For the reasons set forth below, the Court **GRANTS IN PART**

27  and **DENIES IN PART** the request for extradition, and **DENIES** the

28  motion to strike testimony of Ruben Gonzalez.

# I.

## **Background**

A.   <u>Procedural History</u>

In late December 2006, Crotte was arrested by Immigration and Customs Enforcement officials at the San Ysidro Port of Entry while traveling from Mexico to San Francisco.   Respondent's Resp. & Opp'n [Doc. No. 17] (hereafter "Resp't.'s Br.") at 8; Diplomatic Note No. 02187 dated Mar. 23, 2007 from Ambassador Arturo Sarukhan to Secretary of State Condoleezza Rice (hereafter "Diplomatic Note") at 1.[1]   Crotte was therafter placed into removal proceedings before the Immigration Court in San Diego. Resp't.'s Br. at 8 & Ex. B at 282.[2]

On January 24, 2007, the Government filed a Complaint for Provisional Arrest With a View Towards Extradition against Crotte on behalf of Mexico (Doc. No. 1), and the Court issued an arrest warrant for Crotte.   The warrant was executed on March 12, 2007 and Crotte made his first appearance in this matter that same day.   Doc. Nos. 3, 5.   On March 14, 2007, the Government moved the Immigration Court to terminate the removal proceedings. Resp't.'s Br., Ex. B at 282.   The removal proceedings were terminated on March 20, 2007.   <u>Id.</u> at 283.

On March 23, 2007, Mexico requested the extradition of Crotte by submitting Diplomatic Note No. 02187 to the Secretary

---

[1]According to the Diplomatic Note, Crotte was arrested on December 29, 2006.   Respondent states that the arrest took place on December 25, 2006.

[2]Crotte was born in Mexico on September 29, 1969.   Diplomatic Note at 4.   He states that he has resided lawfully in the United States since 1980 and has been a Permanent Resident since 1989. Resp't.'s Br. at 9 & Ex. B at 277.   He also states that he has lived at the same address in San Francisco since 1982.   <u>Id.</u> at 9.

of State of the United States.  Mexico seeks to extradite Crotte to answer charges of (1) Simple Intentional Homicide (hereafter "homicide") and (2) Battery/Bodily Injuries (hereafter "battery") pursuant to an arrest warrant issued by the Eleventh Judge of the Criminal Court of the First Judicial District in Puente Grande, state of Jalisco, on November 5, 1999.  Diplomatic Note at 1; Documentary Evidence Accompanying Extradition Request (hereafter "Doc. Evid."), Ex. 14.

The Government filed a Supplemental Memorandum in Support of Mexico's Request for Extradition on May 1, 2007.  Doc. No. 6.  Crotte was denied bond on June 19, 2007.  Doc. No. 14.  On August 10, 2007, Crotte filed a Response and Opposition to the Government's Request for Extradition.  Doc. No. 17.  The Government's Reply was filed on August 21, 2007.  Doc. No. 20.  On September 11, 2007, the Court granted Crotte's request for a continuance of the extradition hearing, and continued the hearing to September 26, 2007.  Doc. No. 22.  On September 18, 2007, Crotte filed a Request for Extension of Time to File Court Ordered Brief and for the Government to Produce Text of Legal Provisions Under Article 10(2)(d).  Doc. No. 23.  In response, the Government filed an Amended Reply to Response and Opposition to Request to Certify Extradition.  Doc. No. 24.

The Court held an extradition hearing on September 26, 2007.  At the Court's request, Ruben Gonzalez answered certain questions posed by the Court at the conclusion of the hearing.[3]  Following

---

[3]Mr. Gonzalez, who attended the extradition hearing but was not proffered by the Government as an expert witness, is a counsel with the PGR, which, according to the Government, "is the Spanish acronym for the equivalent federal prosecuting agency from Mexico." Transcript of Proceedings, Sept. 26, 2007 (hereafter "Tr."), 4:17-21.

the hearing, on September 28, 2007, the Government filed a motion to strike the testimony of Mr. Gonzalez.  Doc. No. 26.  Crotte filed an opposition to the Government's motion to strike on October 9, 2007.  Doc. No. 27.

B.    The Request for Extradition

Mexico seeks to extradite Crotte to answer the following charges:

(1)  Homicide of Daniel Sandoval Abundis ("Sandoval") on June 26, 1999, in violation of Article 213 of the Penal Code of the State of Jalisco, Mexico (hereafter "Jalisco Penal Code"); and

(2)  Battery of Julio Cesar Sevillano Gonzalez ("Sevillano") on June 26, 1999, in violation of Article 206 of the Jalisco Penal Code.

The evidence submitted in support of the extradition request is comprised of:

(A)  Diplomatic Note No. 02187 dated March 23, 2007 from Ambassador Arturo Sarukhan of the Embassy of Mexico to Condoleezza Rice, Secretary of State of the United States, certified and authenticated on April 20, 2007; and

(B)  Seventeen items of documentary evidence, certified and authenticated on March 16, 2007 by David T. Donahue, Minister Counselor for Consular Affairs for the United States, including:

(1)  Ministerial attestation by Carlos Romero Venegas, Public Prosecutor of the Office of the Attorney General for the State of Jalisco ("Public Prosecutor Romero") dated June 26, 1999.

(2)  Statement by Jose Antonio Nava Valadez to Public

1                 Prosecutor Romero on June 26, 1999.

2     (3)    Ministerial attestation by Public Prosecutor Romero

3             dated June 27, 1999.

4     (4)    Qualificative Medical-Legal Report prepared by Luz

5             Elena Lopez Villaseñor of Green Cross Municipal Medical

6             Services describing wounds suffered by Sevillano.

7     (5)    Statement by Maria Luisa Cuevas Dueñaz(s) to Public

8             Prosecutor Jose De Jesus Herrera Bocanegra ("Public

9             Prosecutor Herrera") on July 14, 1999.

10    (6)    Statement by Sevillano to Public Prosecutor Romero on

11            June 27, 1999.

12    (7)    Death record for Sandoval dated June 27, 1999.

13    (8)    Autopsy report for Sandoval dated June 28, 1999.

14    (9)    Photographs of Sandoval's body.

15    (10)  Statement by Salvador Gonzalez Gonzalez to Public

16            Prosecutor Herrera on July 14, 1999.

17    (11)  Statement by Carlos Crotte Guevara to Public Prosecutor

18            Herrera on July 14, 1999.

19    (12)  Statement by Sevillano to Public Prosecutor Horacio

20            Vega Pamanes on September 2, 1999.

21    (13)  Request for issuance of arrest warrant by Public

22            Prosecutor Herrera dated September 24, 1999, containing

23            summary of evidence and Public Prosecutor's findings.

24    (14)  Arrest warrant issued by the Eleventh Judge of the

25            Criminal Court of the First Judicial District in Puente

26            Grande, state of Jalisco, on November 5, 1999.

27    (15)  Writ by the Court Clerk of the Eleventh Judge of the

28            Criminal Court dated April 22, 2005 certifying the

1    validity of the arrest warrant.

2    (16) Excerpts from Jalisco Penal Code.

3    (17) Statement by Cesar Benitez Castillo dated February 7,

4         2007 identifying person in accompanying photograph as

5         Crotte.

6    **II.**

7    **Legal Standards**

8    Extradition from the United States is a diplomatic process

9    that is initiated by a request from the nation seeking

10   extradition directly to the Department of State.  Prasoprat v.

11   Benov, 421 F.3d 1009, 1010 (9th Cir. 2005).  "After the request

12   has been evaluated by the State Department to determine whether

13   it is within the scope of the relevant extradition treaty, a

14   United States Attorney . . . files a complaint in federal

15   district court seeking an arrest warrant for the person sought to

16   be extradited."  Blaxland v. Commonwealth Dir. of Pub.

17   Prosecutions, 323 F.3d 1198, 1207 (9th Cir. 2003).  "Extradition

18   treaties are to be liberally construed so as to effect their

19   purpose, that is, to surrender fugitives for trial for their

20   alleged offenses."  Valentine v. United States ex rel. Neidecker,

21   299 U.S. 5, 14 (1936).

22   The authority of a magistrate judge serving as an

23   extradition judicial officer is limited to determining an

24   individual's eligibility to be extradited, which is done by

25   ascertaining (1) whether the crime is an extraditable offense

26   under the subject treaty and (2) whether probable cause exists to

27   sustain the charge.  Vo v. Benov, 447 F.3d 1235, 1237 (9th Cir.

28   2006).  If the Court determines that these requisite elements

07mj0177

1  have been met, the findings are incorporated into a certificate

2  of extraditability.  The certificate is forwarded to the

3  Department of State.  The Secretary of State makes the ultimate

4  decision on whether to surrender the fugitive.  18 U.S.C. § 3186.

5  **III.**

6  **Discussion**

7  A.  <u>Determination of Whether the Offenses are Extraditable</u>

8       In determining whether the subject crimes are extraditable

9  offenses, the Court must find that an extradition treaty exists

10 between the United States and Mexico, and that the crimes charged

11 are covered by the treaty.  <u>Vo</u>, 447 F.3d at 1237 (citing 18

12 U.S.C. § 3184).  The Government has submitted a declaration from

13 Gregory Wierzynski of the State Department in Washington, D.C.,

14 dated April 17, 2007, which verifies that the Extradition Treaty

15 between the United States and Mexico, TIAS 9656, was signed on

16 May 4, 1978 and is presently in full force and effect.

17 Wierzynski Decl., ¶ 3.  A copy of the Treaty is attached to the

18 declaration.  Crotte does not contest that the Treaty is in full

19 force and effect.  The Court thus finds that there is a valid

20 extradition treaty in full force and effect between the United

21 States and Mexico.

22      The Treaty sets forth the following with respect to

23 "Extraditable Offenses":

24      1.-Extradition shall take place, subject to this
        Treaty, for wilful acts which fall within any of the
25      clauses of the Appendix and are punishable in
        accordance with the laws of both Contracting Parties by
26      deprivation of liberty the maximum of which shall not
        be less than one year.
27

28 Treaty, art. 2(1).  The Appendix to the Treaty lists the

7

following two offenses:

>     1.   Murder or manslaughter; abortion
>     2.   Malicious wounding or injury.

Article 213 of the Jalisco Penal Code provides the following with respect to homicide offenses:

> An imprisonment penalty from twelve to eighteen years shall be imposed upon whoever kills another person, but in case of an aggravated homicide the imprisonment penalty imposed shall be from twenty to thirty-five years.

Doc. Evid., Ex. 16 at 123.[4]  Article 206 of the Jalisco Penal Code states the following with respect to bodily injury (battery) offenses:

> A person commits the crime of injuries when he causes any harm to another's health.

Id. at 122.  Article 207 of the Jalisco Penal Code provides:

> Whoever is responsible for the crime of injuries that do not endanger life, shall be imposed:
>
> . . .
>
> An imprisonment penalty from three months to two years, whenever the injuries take more than fifteen days to heal.

Id.[5]  Therefore, both of the alleged offenses are specifically set forth as extraditable crimes in the Treaty Appendix and are punishable by a maximum imprisonment of not less than one year, as required by Article 2 of the Treaty.

_____

[4]For ease of reference, the Court's citations to the Documentary Evidence refer to the copies of said evidence attached to Respondent's Brief as Exhibit A, as these copies are labeled with consecutive page numbers.

[5]According to the Qualificative Medical-Legal Report regarding Sevillano's injuries, the wounds inflicted upon Sevillano required more than fifteen days to heal.  Doc. Evid., Ex. 4.

07mj0177

1    Article 2(1) of the Treaty also contains a dual criminality
2  requirement.  Under the principle of dual criminality, "no
3  offense is extraditable unless it is criminal in both
4  jurisdictions." Caplan v. Vokes, 649 F.2d 1336, 1343 (9th Cir.
5  1981) (citing Collins v. Loisel, 259 U.S. 309, 312 (1922)).  "It
6  is well established that all the principle of dual criminality
7  requires is that the particular acts alleged constitute a crime
8  in both jurisdictions." Emami v. United States District Court,
9  834 F.2d 1444, 1450 (9th Cir. 1987).  "The name by which the
10 crime is described in the two countries need not be the same, nor
11 need the scope of the liability for the crimes be either
12 coextensive or the same in both countries." Id. (citations
13 omitted).  Instead, "dual criminality exists if the 'essential
14 character' of the acts criminalized by the law of each country
15 are the same and if the laws are 'substantially analogous.'"
16 Theron v. United States Marshal, 832 F.2d 492, 496 (9th Cir.
17 1987), abrogated on other grounds by United States v. Wells, 519
18 U.S. 482 (1997).  In assessing dual criminality, the extradition
19 magistrate judge may consider, in order of preference, similar
20 criminal provisions of federal law, similar laws of the state in
21 which the fugitive was found, and the law of the preponderance of
22 the states.  Id.

23    Both of the crimes charged against Crotte are violations of
24 United States and California state law.  See, e.g., 18 U.S.C. §
25 1111 (murder); 18 U.S.C. § 1112 (manslaughter); Cal. Penal Code
26 §§ 187 (murder defined), 189 (degrees of murder) & 192
27 (manslaughter); Cal. Penal Code §§ 242 (battery) & 243
28 (punishment for battery).  Because the alleged conduct is

07mj0177

criminal in both the United States and Mexico, the principle of dual criminality is satisfied.

Accordingly, the crimes charged constitute extraditable offenses pursuant to Article 2 of the Treaty. The Court must next examine Crotte's contention that extradition is barred by the statute of limitations.

### 1. Statute of Limitations

Article 7 of the Treaty provides the following with respect to "Lapse of Time":

> Extradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested Party.

Treaty, art. 7. Therefore, the Court must determine whether the criminal prosecution against Crotte is barred by the statute of limitations of either Mexico or the United States.

### a. Statute of Limitations Under Mexican Law

#### i. Homicide Charge

Crotte concedes that the statute of limitations for the homicide charge has not run under Mexican law. Tr., 2:21-3:3.[6]

#### ii. Battery Charge

Crotte argues that the statute of limitations has run under Mexican law with respect to the second charge of battery. He

_____

[6]Under Article 81 of the Jalisco Penal Code, the statute of limitations for a criminal action is equivalent to the "mathematical mean of the minimum and maximum imprisonment penalty which corresponds to the crime" plus "a fourth part more than such term." Doc. Evid., Ex. 16. The imprisonment penalty under Article 213 of the Jalisco Penal Code for a homicide charge is twelve to eighteen years. Id. Thus, according to the Court's calculations, the statute of limitations for the homicide charge in Mexico is 18 years, 9 months.

cites Articles 81, 82 and 85 of the Jalisco Penal Code[7] for the proposition that the statute of limitations for this charge is, at most, 3 years and 3 months, that the statute of limitations began to run on the date of the incident, i.e., June 26, 1999, and that the running of the statute of limitations is interrupted only upon arrest of the defendant.  Crotte was arrested in late December 2006; therefore, far more than 3 years and 3 months passed between the alleged incident, June 26, 1999, and Crotte's arrest.  <u>See</u> Resp't.'s Br. at 11-13; Doc. Evid., Ex. 16.

The Government, in its papers, argues that prosecution of the battery charge is not barred by the statute of limitations under Mexican law, and states that the Court may rely upon Mexico's proclamation that the arrest warrant is valid.  Gov't.'s

---

[7]Articles 81, 82 and 85 of the Jalisco Penal Code, pertaining to "Statute of Limitations of the Criminal Action," provide (as translated):

**Article 81.**  The statute of limitations terms for of the criminal action shall be continuous and shall begin to run, from the moment in which the crime was perpetrated, if the crime is instantaneous; from the date the conduct ceased to be criminal, if the crime is a permanent crime, from the day the last criminal act was perpetrated; if it is a continuous crime; and from the day the last criminal act of a serial crime was carried out, and from the date the last act of preparation took place, if it is a crime of attempt.

**Article 82.**  The criminal action shall be prescribe in a term which is equal to mathematical mean of the minimum and maximum imprisonment penalty which corresponds to the crime; the statute of limitations shall be increased in a fourth part more than such term, if it is penalized by a fine, statute of limitations shall prescribe in six months if it is penalized by dismissal or suspension of rights, the statute of limitations shall be concluded in one year.

**Article 85.**  The statute of limitations of the criminal action shall never be less than three years, three months, and it shall only be interrupted by the arrest of the defendant.

Doc. Evid., Ex. 16.

07mj0177

Reply to Resp. & Opp'n [Doc. No. 20] (hereafter "Gov't.'s Reply"), 2-4; Gov.'t.'s Amended Reply to Resp. & Opp'n [Doc. No. 24] (hereafter "Gov't.'s Am. Reply"), 2-5.  The Court disagrees. The Court is clearly required to conduct an independent analysis of the appropriate statute of limitations when considering a request for extradition.  <u>See</u> Treaty, art. 7; <u>Extradition of Suarez-Mason</u>, 694 F.Supp. 676, 686 (N.D. Cal. 1988). Furthermore, Mexico has only set forth its findings with respect to the application of the Mexican statute of limitations for the homicide charge.  Mexico's documents provide no information in this regard as to the battery charge.  <u>See</u> Doc. Evid., Ex. 15 & Gov't.'s Am. Reply, Ex. A (both containing Mexico's analysis of the statute of limitations under the Jalisco Penal Code for the homicide charge, but not the battery charge).

At any rate, the Government conceded at the extradition hearing that prosecution of the battery charge is barred by the language of Article 85 of the Jalisco Penal Code.  Tr., 7:6-9:19. The Court's reading of Article 85 leads to the same result.  The Court accordingly finds that prosecution of the battery charge is barred by the statute of limitations under Mexican law.  Crotte therefore cannot be extradited to Mexico for prosecution of this charge.

        b.   <u>Statute of Limitations Under United States Law</u>

Crotte also argues that the statute of limitations has run as to both charges under United States law.[8]  Crotte contends

---

[8]In view of its finding that Crotte cannot be extradited for prosecution of the battery charge, the Court shall consider whether the statute of limitations has run under United States law as to the homicide charge only.

1  that 18 U.S.C. § 3282, which provides the federal statute of

2  limitations for non-capital offenses, applies.  Section 3282

3  provides in relevant part:

> Except as otherwise expressly provided by law, no
> person shall be prosecuted, tried, or punished for any
> offense, not capital, unless the indictment is found or
> the information is instituted within five years next
> after such offense shall have been committed.

7  18 U.S.C. § 3282(a).  Crotte asserts that the arrest warrant

8  issued in Mexico on November 5, 1999 did not toll the statute of

9  limitations because it does not constitute an indictment or

10 information within the meaning of § 3282(a).  Resp't.'s Br. at

11 16-17 & 19-22.  He thus argues that the statute of limitations

12 ran five years after the homicide was allegedly committed, i.e.,

13 on June 26, 2004.  Id. at 17.

14           i.   Determination of Applicable Statute of
                  Limitations

16      As an initial matter, the Court must determine which statute

17 of limitations under United States law applies to the Mexican

18 homicide charge.  To do so, the Court must look to the

19 substantive offense under United States law which is most closely

20 analogous to the charged offense, and apply the statute of

21 limitations applicable to that offense.  Extradition of Suarez-

22 Mason, 694 F.Supp. at 686.  Here, the homicide charge in Mexico

23 is most analogous to the federal crimes set forth at 18 U.S.C. §

24 1111 (murder)[9] and 18 U.S.C. § 1112 (manslaughter)[10].

---

[9]18 U.S.C. § 1111 provides in relevant part:

Murder is the unlawful killing of a human being with malice
aforethought.  Every murder perpetrated by poison, lying in
wait, or any other kind of willful, deliberate, malicious,
and premeditated killing; or committed in the perpetration
of, or attempt to perpetrate, any arson, escape, murder,

07mj0177

There is Ninth Circuit authority which provides that "for purposes of international extradition from the United States, murder is a capital offense falling under 18 U.S.C. § 3281 rather than 18 U.S.C. § 3282." Extradition of Kraiselburd, 786 F.2d 1395, 1398 (9th Cir. 1986), citing Quinn v. Robinson, 783 F.2d 776 (9th Cir. 1986). Under § 3281, no statute of limitations applies to capital offenses, defined as "any offense punishable by death." 18 U.S.C. § 3281. Notwithstanding this authority, the Government does not contend that the charge against Crotte is a capital one for which no statute of limitations under United States law should apply. Although not entirely clear, it appears

> kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

18 U.S.C. 1111(a).

[10]18 U.S.C. § 1112 provides in relevant part:

> Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
>
> Voluntary—Upon a sudden quarrel or heat of passion.
>
> Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.
>
> . . .
>
> Whoever is guilty of voluntary manslaughter, shall be fined under this title or imprisoned not more than ten years, or both;
>
> Whoever is guilty of involuntary manslaughter, shall be fined under this title or imprisoned not more than six years, or both.

18 U.S.C. § 1112(a)-(b).

07mj0177

1  that the Government likewise contends that the five year statute
2  of limitations under § 3282 applies.  See Gov't.'s Reply at 3
3  (referring to five year statute of limitations period).

4      When determining the analogous United States offense for
5  extradition purposes, the primary focus should be on the nature
6  of the conduct charged.  Clarey v. Gregg, 138 F.3d 764, 766-77
7  (9th Cir. 1998).  Although Crotte's alleged conduct could
8  possibly be characterized as first degree murder - a capital
9  crime not subject to a statute of limitations - the evidence
10 submitted by Mexico more strongly resembles second degree murder
11 or manslaughter, which are non-capital offenses.  Accordingly,
12 the Court declines to apply Kraiselburd and instead finds that
13 the five year statute of limitations in 18 U.S.C. § 3282 is
14 applicable to the homicide charge against Crotte.

15              ii.  Analysis

16      The Court must next determine whether prosecution of the
17 homicide charge is barred by the five year statute of limitations
18 set forth in § 3282.  Again, the Government contends that the
19 issuance of the arrest warrant in Mexico in 1999 was sufficient
20 to satisfy the five year statute, while Crotte argues that the
21 arrest warrant did not toll the statute of limitations because it
22 does not constitute an indictment or information.

23      Although the Ninth Circuit has not squarely addressed the
24 issue, it can be inferred from various decisions that the
25 appropriate measure when considering whether charges are barred
26 by the five year statute of limitations in 18 U.S.C. § 3282 is
27 the length of time between when the alleged criminal act occurred
28 and when foreign charges were filed.  In other words, in order to

07mj0177

fall within the statute of limitations, the accusatory instrument must be filed within five years of the commission of the crime. In Caplan, for example, the Ninth Circuit stated that § 3282 "bars most non-capital prosecutions where *charges* have not been brought within five years." Caplan, 649 F.2d at 1340 (emphasis added). The court subsequently found that "[m]easuring from the date of the London arrest warrant, May 18, 1978, we are concerned under this inquiry with charges involving acts prior to May 18, 1973." Id. In Theron, the Ninth Circuit determined that a 1981 indictment in South Africa had been filed within the federal five year statute of limitations because it expressly incorporated charges from a 1979 South African indictment which had been issued within five years of the alleged offense. Theron, 832 F.2d at 499-500; see also Extradition of Suarez-Mason, 694 F.Supp. at 687 (finding extradition for kidnapping offenses to be time-barred by the statute of limitations under § 3282 because offenses allegedly occurred in January 1979 and charges in Argentina were not filed until December 1984, over five years later); Jhirad v. Ferrandina, 486 F.2d 442, 443 (2d Cir. 1973) (Jhirad I) (analyzing period between the date alleged offenses occurred and the date charges were brought by government of India for statute of limitations purposes); Restatement (Third) of Foreign Relations Law § 476 cmt. e (1987) ("For purposes of applying statutes of limitation to requests for extradition . . . the period is generally calculated from the time of the alleged commission of the offense to the time of the warrant, arrest, indictment, or similar step in the requesting state, or of the filing of the request for extradition, whichever occurs first.")

1    Here, the homicide allegedly occurred on June 26, 1999 and

2  the Mexican arrest warrant -- the charging instrument under

3  Mexican legal procedure -- was issued on November 5, 1999.

4  Applying the above principles, the Mexican prosecution was timely

5  commenced under the applicable United States statute of

6  limitations.  Although Crotte contends that the courts in the

7  above cases simply made assumptions about whether a foreign

8  proceeding tolls the statute of limitations, and that such

9  assumptions are merely dicta (see Resp't.'s Br. at 19 n.19), it

10 is important to note that Crotte does not provide any authority

11 supporting his argument that the Mexican arrest warrant did not

12 toll the statute.  The Court finds the authorities discussed

13 above to be persuasive in stating that the proper calculation in

14 applying the United States statute of limitations is from the

15 date of the alleged offense to the date on which charges were

16 instituted under the legal procedure of the requesting state.

17    Additionally, a component of Crotte's argument is that the

18 Mexican arrest warrant did not toll the statute of limitations

19 because it does not constitute an "indictment" or "information,"

20 as those terms are used in § 3282.  In essence, then, Crotte asks

21 this Court to apply the U.S. statute of limitations, which

22 incorporates indictments, informations and common law concepts,

23 to the Mexican judicial system, in which these concepts are

24 unknown.  The Ninth Circuit, however, has expressly stated that

25 "[I]t is inappropriate to engage in . . . an inquiry into the

26 formal procedure a country uses in instituting prosecution."

27 Theron, 832 F.2d at 499-500 (citing Matter of Assarsson, 635 F.2d

28 1237, 1244 (7th Cir. 1980)); see also Emami, 834 F.2d at 1449

07mj0177

1    ("We refrain from interpreting the requirements of German

2    criminal procedure both out of respect for German sovereignty and

3    because we recognize the chance of erroneous interpretation is

4    much greater when we try to construe the law of a country whose

5    legal system is not based on common law principles.")  In any

6    event, a finding that the Mexican arrest warrant is the

7    equivalent of an indictment for statute of limitations purposes

8    is consistent with results in other cases which have accepted the

9    foreign authority's arrest warrant as the charging instrument

10   equivalent to an indictment.  See, e.g., Caplan, 649 F.2d at

11   1340; Jhirad I, 486 F.2d at 443; Jhirad v. Ferrandina, 536 F.2d

12   478, 480 (2d Cir. 1976) (Jhirad II) (describing India's foreign

13   charging document as the "functional equivalent" of a U.S.

14   indictment).

15       Therefore, for all of the foregoing reasons, the Court finds

16   that prosecution of the homicide charge is not barred under the

17   applicable United States statute of limitations.[11]

18       2.   Article 14 of the Treaty

19       Crotte argues that because the Mexican statute of

20

21       [11]In view of this finding, it is not necessary for the Court to
     determine whether the statute of limitations was tolled by the
22   fugitive provision set forth at 18 U.S.C. § 3290, which provides that
     "[n]o statute of limitations shall extend to any person fleeing from
23   justice."  Nonetheless, the Court observes that "[i]n order to prove
     flight under § 3290, the government must show by a preponderance of
24   the evidence that [Respondent] acted with an intent to avoid
     prosecution."  United States v. Fowlie, 24 F.3d 1070, 1072 (9th Cir.
25   1994).  The Government, which devotes only one short paragraph to the
     issue (see Gov't.'s Reply at 6), has not made the requisite showing.
26   "Fleeing from justice" requires a "volitional act" coupled with
     intent.  Fowlie, 24 F.3d at 1072 (citing United States v. Wazney, 529
27   F.2d 1287, 1289 (9th Cir. 1976)).  The Government has provided no
     information which would permit the Court to even analyze the issue,
28   let alone conclude that Crotte was fleeing from justice within the
     meaning of § 3290.

1  limitations has run on the second charge of battery, thus barring

2  his extradition for that charge, Article 14 of the Treaty

3  prohibits his extradition for the first charge of homicide.  See

4  Resp't.'s Br. at 13-15.  Article 14 ("Decision and Surrender")

5  provides in relevant part:

6      1.-The requested Party shall promptly communicate to
       the requesting Party its decision on the request for
7      extradition.

8      2.-In the case of complete or partial rejection of a
       request for extradition, the requested Party shall give
9      the reasons on which it was based.

10     3.-If the extradition is granted, the surrender of the
       person sought shall take place within such time as may
11     be prescribed by the laws of the requested Party.  The
       competent authorities of the Contracting Parties shall
12     agree on the date and place of the surrender of the
       person sought.

13

14  Treaty, art. 14.

15      Crotte contends that subsection 2 of Article 14 sets forth

16  in full the requested party's obligations in the event of a

17  "partial rejection" of a request for extradition, and reasons

18  that such obligations do not include "surrender of the person

19  sought."  Rather, "surrender of the person sought" is only

20  permitted pursuant to subsection 3, which applies only if the

21  "extradition is granted."  Resp't.'s Br. at 14.  In other words,

22  Crotte argues that "surrender of the person sought" is allowed

23  only upon a "complete grant of extradition on all bases submitted

24  by the requesting party."  Id.  At the extradition hearing,

25  Crotte confirmed that it is his view that under the Treaty, there

26  cannot be an extradition on less than the full number of crimes

27  for which an extradition is sought, as extradition is premised on

28  the ability to surrender.  Tr., 10:5-12.  In other words, Crotte

1  believes the Court must find extraditability as to all charges or
2  it cannot extradite on any charges. Id., 10:16-18.

3      Crotte has provided no authority supporting this
4  interpretation of Article 14, and the Court finds that his
5  interpretation is at odds with the plain language and meaning of
6  this Article. Subsection 2 of Article 14 simply states that in
7  the event of a complete or partial rejection of a request for
8  extradition, the *reasons* on which it is based must be given; it
9  does not address the surrender of the person sought to be
10 extradited, which is the subject of subsection 3, and does not
11 set forth in full the requested party's obligations upon a
12 "partial rejection" (i.e., "partial grant") of a request for
13 extradition. Moreover, subsection 3 does *not* state that the
14 person sought to be extradited can only be surrendered upon a
15 *complete* grant of extradition on all bases urged by the
16 requesting party. Instead, this subsection only states that
17 surrender shall take place within such time as is prescribed by
18 the laws of the requested party "[i]f the extradition is
19 granted." Clearly, if the drafters of the Treaty intended to
20 provide that the person sought to be extradited could *only* be
21 surrendered in the event of a *complete* grant of extradition on
22 all requested bases, they would have said so.

23     Crotte's interpretation of Article 14 is not only
24 unsupported by the plain language of the article, but violates
25 the principle that "[E]xtradition treaties are to be liberally
26 construed so as to effect their purpose, that is, to surrender
27 fugitives for trial for their alleged offenses." Valentine, 289
28 U.S. at 14. Furthermore, as discussed below, Article 17 of the

1  Treaty supports the view that extradition is proper where some,

2  but not all, bases for an extradition request are granted.

3          3.   Article 17 of the Treaty

4          Crotte contends that pursuant to Article 17 of the Treaty,

5  "Rule of Speciality," Mexico must guarantee that Crotte will not

6  be prosecuted for an offense other than that for which

7  extradition has been granted.  Resp't.'s Br. at 15.  He states

8  that absent such a guarantee, Crotte should not be extradited for

9  those offenses which are not time-barred.  Id. at 15-16.  As with

10 the above argument, he does not cite any case authority for this

11 proposition.

12         Article 17 of the Treaty provides in relevant part:

13         A person extradited under the present Treaty shall not
           be detained, tried or punished in the territory of the
14         requesting Party for an offense other than that for
           which extradition has been granted . . . .
15

16 Treaty, art. 17.  The Government counters that both the United

17 States and Mexico are bound by the explicit speciality provisions

18 in the treaty, and that no additional assurances are needed.

19 Gov't.'s Reply at 8.

20         The Court agrees with the Government.  Article 17 means what

21 it says, and there is no separate requirement that Mexico

22 acknowledge that it has to do something that it clearly already

23 must do pursuant to the terms of Article 17.  Crotte has

24 presented no reason or authority for this Court to require that

25 Mexico provide a "guarantee," above and beyond the provisions of

26 Article 17, that Crotte will not be prosecuted for an offense

27 other than that for which extradition is granted.  Moreover, the

28 language of Article 17 demonstrates that the Court is to make

findings as to each charge, and further, necessarily assumes that the Court can extradite as to some charges but not others. Thus, Article 17 supports the view that there *can* be an extradition on less than the full number of crimes for which extradition is sought, contrary to Crotte's argument discussed above. As the Ninth Circuit stated in <u>Theron</u>,

> The principle of speciality . . . requires [the court to] examine each charge . . . to ensure that the charges are not time-barred because the requesting country can only prosecute those offenses that the asylum country has found extraditable. [Citation omitted.] If a charge is barred by the statute of limitations, then a defendant is not extraditable *on that charge*.

<u>Theron</u>, 832 F.2d at 498 (emphasis added).

B.   <u>Probable Cause</u>

The central function of the extradition magistrate judge is to determine whether there is competent evidence to justify holding the accused to await trial in the requesting state, and not to determine whether the evidence is sufficient to justify a conviction. <u>Collins</u>, 259 U.S. at 316; <u>see also</u> <u>United States v. Wiebe</u>, 733 F.2d 549, 553 (8th Cir. 1984) ("The extradition hearing is not a trial on the merits to determine guilt or innocence, but serves as a means of ensuring that probable cause exists to believe the person whose surrender is sought has committed the crime for which his extradition is requested."); <u>Hooker v. Klein</u>, 573 F.2d 1360, 1367 (9th Cir. 1978). "The probable cause standard applicable in extradition proceedings is defined in accordance with federal law and has been described as 'evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the

1   accused's guilt.'"  Wiebe, 733 F.2d at 553 (citation omitted).

2   The judicial officer who conducts an extradition hearing "thus

3   performs an assignment in line with his or her accustomed task of

4   determining if there is probable cause to hold a defendant to

5   answer for the commission of an offense."  Lo Doca v. United

6   States, 93 F.3d 1100, 1104 (2nd Cir. 1996).

7        1.   Admissibility of Evidence

8        The admissibility of evidence in extradition matters is

9   controlled by 18 U.S.C. § 3190, which provides as follows:

10          Depositions, warrants, or other papers or copies
            thereof offered in evidence upon the hearing of any
11          extradition case shall be received and admitted as
            evidence on such hearing for all purposes of such
12          hearing if they shall be properly and legally
            authenticated so as to entitle them to be received for
13          similar purposes by the tribunals of the foreign
            country from which the accused party shall have
14          escaped, and the certificate of the principal
            diplomatic or consular officer of the United States
15          resident in such foreign country shall be proof that
            the same, so offered, are authenticated in the manner
16          required.

17   18 U.S.C. § 3190; Escobedo v. United States, 623 F.2d 1098, 1103

18   (5th Cir. 1980) (stating that section 3190, not state law,

19   controls admissibility).  "[A]uthentication is the only

20   requirement for admissibility of evidence under general United

21   States extradition law.  Oen Yin-Choy v. Robinson, 858 F.2d 1400,

22   1406 (9th Cir. 1988); see also Zanazanian v. United States, 729

23   F.2d 624, 627 (9th Cir. 1984).

24        The documents submitted in this case were properly

25   authenticated, and Respondent has not presented any argument or

26   evidence to the contrary.  As long as there is no conflict with

27   the provisions of the subject treaty, evidence that has been

28   authenticated is admissible in extradition proceedings.  Emami,

07mj0177

834 F.2d at 1451.  Article 10 of the Treaty addresses the

admissibility of documents in evidence:

> The documents which, according to this Article, shall
> accompany the request for extradition, shall be
> received in evidence when:
>
> . . . .
>
> b) In the case of a request emanating from the United
> Mexican States, they are certified by the principle
> [sic] diplomatic or consular officer of the United
> States in Mexico.

Treaty, art. 10(6).  Here, Mexico's request for extradition and

supporting documents comply with this requirement, as the

documents were properly certified by the principal consular

officer of the United States in Mexico.  Therefore, under the

general extradition law of the United States and the provisions

of the Treaty, all of the documents submitted are admissible for

purposes of this extradition proceeding.

     The Supreme Court has found that extradition may be

predicated entirely on the "unsworn statements of absent

witnesses."  Collins, 259 U.S. at 317.  Indeed, both sworn and

unsworn statements contained in properly authenticated documents

are permissible.  Artukovic v. Rison, 784 F.2d 1354, 1356 (9th

Cir. 1986).  Additionally, hearsay evidence is permitted in

extradition proceedings.  Escobedo, 623 F.2d at 1102 n.10; Sayne

v. Shipley, 418 F.2d 679, 685 (5th Cir. 1969).  This includes

multiple hearsay.  See Escobedo, 623 F.2d at 1102 (permitting

written third-party account of deposition testimony); Zanazanian,

729 F.2d at 627 (permitting police report describing a witness

statement).

//

2.   <u>Probable Cause:  Homicide Charge</u>

a.   <u>Summary of Evidence</u>

Crotte is accused of the homicide of Daniel Sandoval Abundis
on June 26, 1999.  According to the documentary evidence
submitted in support of the extradition request, on June 24,
1999, two days before the alleged incident, Sevillano (the
alleged battery victim), was standing outside his house at 9:00
p.m. with a friend, Fernando, when another friend, Martin (known
as "El Martin") arrived in his car with two other friends.  Doc.
Evid., Ex. 12 (statement by Sevillano dated Sept. 2, 1999) at 47-
48.  Martin told Sevillano and Fernando that "Dany" (Sandoval)
was being "beaten by the band 'Los Tejones'."  <u>Id.</u> at 48.
Everyone agreed to go and help out Sandoval, and they got into
Martin's car.  Martin drove to the corner of Cuauhtemoc and
another street, where Sevillano saw that "Los Tejones" were
beating up his friends Sandoval, Desiderio (known as "El Desi"),
and Martin (known as "El Bulbo").  <u>Id.</u>  "Los Tejones" were
comprised of Saul, his brother "El Tejon," David and Rigoberto
(who are brothers), and "Aldo" (Crotte).  <u>Id.</u>  Sevillano and his
four friends got out of their car.  The members of Los Tejones
went back toward Aldo's car, described as a white station wagon-
like Chevrolet, and got in.  <u>Id.</u>  Crotte put his left hand out of
the car and Sevillano saw that he was holding a gun "that looked
like a revolver."  <u>Id.</u>  Crotte shot the gun four or five times
toward Sevillano and his friends, but did not injure anybody.
Crotte then drove his car away and went with his friends to the
"chapel."  <u>Id.</u>  Sevillano and his friends returned home.  <u>Id.</u>
The following day, on June 25, 1999 at 10:00 p.m.,

25

Sevillano, Sandoval, and four others were drinking beer outside "El Roger's" house when they all agreed to go the next day "to fuck Los Tejones to avenge" the beating the previous day.  They agreed to meet at Roger's house the following day at 9:00 p.m. Id.; see also Doc. Evid., Ex. 13 (summary of statement by Rogelio Rios Martinez) at 63.

On June 26, 1999 around 9:00 p.m., Sevillano, his brother Juan, Sandoval, "El Roger," "El Rata," "El Bulbo," and others, totaling about twenty people, gathered at Roger's house.  Doc. Evid., Ex. 12 at 48-49.  According to Sevillano, "We started to talk about going to the place where Los Tejones were and once we all agreed; we left walking without carrying any sticks, stones, pipes or any other kind of weapon."  Id. at 49.[12]

There are multiple accounts of the events which then transpired.  According to Sevillano's signed,[13] sworn statement rendered on June 27, 1999 at 1:30 a.m., within hours after the alleged incident:

> [W]e were walking along Calle La Milpa in Colonia el Vigia, because we were going to fight some guys named "Los Tejones" because we were going to defend my friend Daniel, since he told us two days earlier they had been bothering him and I want to mention that I know these guys "Los Tejones" because they live a few blocks from my house and we directly arrived to the house of three of those individuals, which is located in Calle Milpa; those three who live in the house where we arrived are Rigo and David, who are brothers and whose surnames I ignore, and Aldo Omar [Crotte], and when we arrived to that house we yelled at them "come out bastards," and in that moment the two brothers Rigo and David came out, as well as Aldo Omar [Crotte], and I saw he was

---

[12]As will be discussed further below, there is evidence which contradicts the latter half of this statement.

[13]Sevillano "signed" this statement with a fingerprint as he was unable to sign his name due to injuries sustained in the subject incident.

> holding a gun with his hand, and shoot at Daniel and
> me, who were walking ahead, as well as at the rest of
> my friends, and suddenly I felt my right hand wounded,
> and the left side of my chest was hurting bad, so we
> ran around the corner and my friend[s] Cain Juan and
> Juanito Alcala arrived in a car which I boarded so they
> brought me to the Green Cross [medical center], and I
> want to mention that before they brought me to the
> Green Cross, that is when I still was at the place
> where the facts took place, I saw that my friend Daniel
> fell to the ground, and therein my friends kicked
> Aldo's car and threw stones at the house.

Doc. Evid., Ex. 6 at 23; <u>see also</u> Doc. Evid., Ex. 1 (Ministerial

Attestation by Public Prosecutor Romero of June 26, 1999

including a summary of a statement given by Sevillano at the

emergency room).  A couple of months later, on September 2, 1999,

Sevillano provided another signed statement which was given under

penalty of perjury.  This statement described the events of June

26, 1999 as follows:

> Once we were walking we got to the corner of De La
> Milpa street.  The first to get there were my friend El
> Dany and I the rest of my friends were behind, the
> house of brothers David and Rigoberto is on that
> corner, their house is in front of a temple or chapel,
> so when El Dany and I were outside the brothers' house
> in which Aldo also lives, we started to yell at them
> "come out assholes to kick your ass" we did it several
> times so Aldo went out holding the same weapon that he
> had used to shoot at us previously as I stated before.
> When Aldo went out he ran towards us aiming his gun at
> us, so Dany and me were going back, it was at that
> moment that he started shooting at us as the brothers
> David and Rigoberto were going out too.  When Aldo was
> shooting us I felt my right hand injured and at the
> same time I felt my chest right under my left nipple
> injured too.  I felt that I was wounded and fell to the
> ground as I was going back, since Aldo was shooting us
> as we were retreating.  When I was on the ground I
> didn't see where my friend Dany had gone because I was
> a bit unconscious and dizzy, but I felt that I was
> being dragged by my shoulders.  I got better after a
> while and then I noticed that my friends were carrying
> my friend Dany and left him laying on his back, so I
> went towards Dany and noticed that there was a hole on
> his shirt around the left part of his chest.

Doc. Evid., Ex. 12 at 49.

1   Jose Antonio Nava Valadez, who was part of Sandoval and
2   Sevillano's group, provided the following signed and sworn
3   statement on June 26, 1999 at 11:30 p.m., just hours after the
4   shooting:

5   [W]hen we were getting to the chapel, some of my
    friends started yelling fucking stuff like "hey you
6   whiners, get out of your house, mother fuckers," and
    then a guy came out of his house, and started shooting
7   towards where we were with his gun, and when we heard
    the shooting, we ran back, and ran like half a block,
8   and when this guy stopped shooting, he went back into
    his house, so then we saw my friend Daniel lying on the
9   ground . . . I want to state that I didn't know how
    many times that guy shot, but he did it several times,
10  and that guy who shot, was short, had black hair, Van
    Dyke beard, and he entered a house which is in front of
11  the chapel that is in El Vigia.

12  Doc. Evid., Ex. 2 at 9.

13      On June 27, 1999, shortly after midnight, Public Prosecutor
14  Romero visited the crime scene in Colonia El Vigia, in the
15  Municipality of Zapopan, Jalisco.  There, he observed three
16  buildings on Calle La Milpa:  number 376, a chapel; number 380, a
17  building; and number 373, a two story house.  Numbers 376 and 380
18  each had orifices which were "seemingly produced by firearm
19  projectile."  Doc. Evid., Ex. 3 at 12.  Number 373, which stood
20  in front of the other two buildings, had two broken windows.  Id.
21  While there, Romero interviewed Maria Luisa Cuevas Dueñas, the
22  owner of the house, who told him that Crotte had come from the
23  United States six days before and was renting a room from her.
24  With respect to the events that had transpired earlier in the
25  evening, she stated:

26  Aldo had arrived in a white vehicle of his own, and the
    individuals damaged the car throwing stones at it and
27  assaulted him, *for what he took out a gun*, and from the
    corner of Calle La Milpa and Calle El Lazo, *he shot at*
28  *those individuals*.

28

07mj0177

1   Id. at 13 (emphases added).  A couple of weeks later, on July 14,

2   1999, she rendered the following signed statement under penalty

3   of perjury:

4           [O]n June 26th . . . on that night at around . . . 9:30
        I went to buy bread and milk to the bakery store
5       located by Calle Cuauhtemoc and La Milpa, along with my
        two grand children, Juan Pablo and Susi, of four and
6       six years of age respectively; suddenly, when I came
        out of the bakery store, I saw a group of more than ten
7       or fifteen boys, who were holding rocks in their hands,
        and two of them were holding guns in their hands, all
8       of them were walking along Calle Cuauhtemoc, and I saw
        that they turned by Calle La Milpa, it was then when I
9       was walking behind them and I saw that those who were
        holding rocks started to throw them at my house,
10      breaking windows while they were yelling "Let's fuck
        that sissy," and suddenly they headed to the corner of
11      La Milpa and Cerrada del Lazo, where out of the temple,
        the car of a family friend was parked, he is a person
12      to whom my husband, my children and I house when he
        comes from San Francisco; and he is named Aldo Omar
13      Crotte, I could clearly see so because I was quickly
        going to my house while seeing that they were breaking
14      the glasses of my house, that they started break the
        glasses of Aldo's car and he was inside the vehicle
15      while they were telling him "Get out sissy, we are
        going to kill you and to fuck you," and they kept
16      throwing stones at his car, and suddenly, Aldo came out
        of the vehicle and ran to the house, it was then when I
17      heard roaring, as pop of corn, and everybody started
        running all around, and it was then when I arrived
18      home, Aldo was coming out, and without saying anything,
        he got into his car and left the place, seemingly
19      afraid that those individuals would come back to harm
        him or beat him; at home were my husband Salvador
20      Gonzalez Gonzalez and my son Vicente Gonzalez Cuevas.
        . . . . The physical description of Aldo Omar Crotte is
21      as follows:  about 28 years of age, 1.67 meters tall,
        strong build, light brown skin, short brown hair,
22      round-shape face, regular forehead, bushy eyebrows,
        light brown hair, regular nose, regular mouth, thin
23      lips, he uses moustache, Van Dyke beard . . . .

24  Doc. Evid., Ex. 5 at 18-19.  Cuevas's second statement does not

25  include a declaration that Crotte fired a gun, as her first

26  statement does.

27      Ms. Cuevas's husband, Salvador Gonzalez Gonzalez, provided a

28  signed, sworn statement on July 14, 1999:

                                29                          07mj0177

That with regard to the facts that took place on Saturday, June 26th . . . that day at around eight thirty at night, I was inside my house . . . in my bedroom, and my son Vicente Gonzalez Cuevas, was in the upper floor, since my wife Maria Luisa Cuevas Dueñas had gone out along with my two grand children to buy milk and bread, suddenly a glass was broken while I was in my bedroom lying on my bed, and since the glasses fell on my body, I stuck my head out of the window and I saw many boys, like fifteen, because I can clearly see to the street from my window, and among them, there were two whom I saw at a distance of eight meters, and they were armed with guns while all of them were saying, "Let's fuck that sissy," but I could not see . . . who they were talking about, and I tried to go out to the street, but I heard noise, like corn popping, and I stayed inside the house, that is behind the entrance door, which was not fully closed, and suddenly Aldo, who is a friend of the family for years and lives in my house came in running, and without saying a thing, he went upstairs to his room and like he came in, he went out and I saw that he was boarding his car which was parked on the corner of the house, that is outside the church, in the enclosed street named El Lazo and La Milpa, and he left, the glasses of his car broken; I ignore where Aldo had gone, but I want to point out that Aldo came into the house running after the noise I heard, and all of the boys were running randomly, and I could not see where they went; right after Aldo left on his car, my wife Maria Luisa arrived and she told me what had happened, since she had seen when those boys had been throwing stones at the house and were threatening Aldo, they had even broken the glasses of his car, but we did not know why.

Doc. Evid., Ex. 10 at 40-41.

Carmen Becerra Guerrero also provided a statement, which was summarized in the request for the arrest warrant:

[T]he day the facts took place being around [9:30 p.m.] she was buying some corns on the cob and saw a bunch of boys and girls coming, some of them take out guns from little haversacks and started to shoot towards calle Milpa while yelling "Don't chicken out, don't you have any balls, come and get some, I'll stick it up your ass," then suddenly these guys began to run while a young guy fall to the floor.

Doc. Evid., Ex. 13 at 60-61.[14]  Vicente Gonzalez Cuevas, the son
of Maria Luisa Cuevas Dueñas and Salvador Gonzalez Gonzalez,
provided a statement which was also summarized in the request for
the arrest warrant:

> [T]he day [the] facts took place being around [10:00
> p.m.], he was sleeping in his house when he heard some
> noises coming from the street, so he stood up and stuck
> his head out of the window seeing there were around 25
> guys who were throwing stones at his house and yelling
> "Get out you motherfuckers, this time we are going to
> kill you."  [T]hree of them were carrying guns, so he
> went back and saw how they broke the glass of the
> window, then he heard several explosions made by a
> firearm, then the guys who were attacking started
> retreating . . . .

Id. at 61.

Finally, the request for the issuance of an arrest warrant
contained two summaries of a statement (or statements) rendered
by Rogelio Rios Martinez:

> [O]n Saturday, June 26th, of the current year, in Calle
> San Francisco, Zapopan, [h]e got together with some of
> his friends and among them there were Daniel Sandoval
> Abundis, Martin Navarro, Jose Antonio Nava, and others
> whose names and surnames he ignored.  They were about
> twenty and Daniel told them they were to go to Colonia
> El Vigia to fight some "fucking batos" since they were
> upsetting him, they got to El Vigia without knowing the
> exact place but it was near a chapel, since they saw
> nobody they were going back, when they had walked a few
> meters they heard gunshots so all of them ran like half
> a block towards Avenida Hidalgo, when they heard no
> more gunshots they went back to the same place, then he
> heard other gunshots, without knowing either how many
> they were or who had shot, then he saw his friend
> Daniel falling down . . . .

Doc. Evid., Ex. 13 at 53.  The second summary provides:

> [W]hen they got to the corner of calle La Milpa they
> saw three guys who were members of the band Los Tejones

---

[14]As Crotte observes (see Resp't.'s Br. at 5 n.6), the documentary
evidence submitted in support of the extradition request does not
contain a copy of Ms. Becerra's actual statement; rather, only a
summary of Ms. Becerra's statement is provided.

1  coming out of a house which is in front of the chapel.
2  One of them was arguing with Dany and Julio Cesar, he
   saw that one of them had a gun revolver like using it
3  to shoot two times at Dany and Julio Cesar and all the
   others with them began running back and no more
4  shooting was heard, thus they went back to the place
   where the three members of the band were and they saw
5  the same guy shooting again at their friends Dany and
   Julio Cesar and at that moment his friends went down to
6  the ground.

7  Id. at 63-64.

8       The Court may properly consider all of the above evidence in

9  its probable cause determination, whether sworn or unsworn, or

10  whether the evidence consists of an actual statement given by a

11  witness or a summary thereof.   See Artukovic, 784 F.2d at 1356;

12  Zanazanian, 729 F.2d at 627.

13            b.   Discussion

14       The Court finds that Sevillano's statements demonstrate

15  probable cause that Crotte committed the homicide of Sandoval.

16  Sevillano definitively identified Crotte as the person who shot

17  both him and Sandoval.  He made this identification within an

18  hour of the shootings (see Ministerial Attestation, Doc. Evid.,

19  Ex. 1 at 7), when he gave an official statement to the Public

20  Prosecutor shortly thereafter (see Doc. Evid., Ex. 6 at 23), and

21  when he provided a supplemental statement on September 2, 1999

22  (see id., Ex. 12 at 49).  He was able to identify Crotte because

23  of his familiarity with "Los Tejones," who lived a few blocks

24  away from him.   Id., Ex. 6 at 23; see also Cuevas Statement, Doc.

25  Evid., Ex. 5 at 19 (describing Sevillano and Sandoval as "persons

26  whom I know" as they lived in her neighborhood).  He was also

27  familiar with Crotte as a result of the June 24, 1999 encounter

28  between "Los Tejones" and Sevillano, Sandoval and their friends.

Furthermore, Sevillano stated that he recognized the revolver that Crotte pulled out during the shootings of June 26, 1999 as the same weapon he used during the June 24, 1999 incident.  Id., Ex. 12 at 48-49.  The Court deems the Ministerial Attestation (Doc. Evid., Ex. 1), which was signed by the Public Prosecutor, and both of Sevillano's signed statements (id., Exs. 6 & 12), which were given under oath or penalty of perjury, to be sufficiently reliable to be deemed competent evidence to establish probable cause that Crotte committed the homicide of Sandoval.

In addition, other documentary evidence provides support for Sevillano's statements.  Significantly, Maria Luisa Cuevas Dueñas, the owner of the home in which Crotte, a friend of the family, was staying, initially told the Public Prosecutor that Crotte took out a gun and shot at the crowd.  Doc. Evid., Ex. 3 at 13.  Although her later statement -- provided over two weeks after the incident -- does not include this information, her initial statement, which the Court deems more reliable as it was given within three hours of the shooting, provides confirmation that Crotte fired gunshots on the night in question.  Additionally, Nava's statement that the "guy" who shot at his friends "went back into his house" (id., Ex. 2 at 9), when considered in conjunction with Salvador Gonzalez Gonzalez's statement that Crotte ran into his house *after* Gonzalez heard the "corn popping" noise (id., Ex. 10 at 41), provides further support that Crotte fired shots at Sandoval.

Crotte argues that probable cause does not exist.  None of Crotte's arguments, however, has any merit.  For instance, Crotte

07mj0177

argues that there is no credible evidence that Crotte was the
person who discharged the firearm that caused Sandoval's
homicide.  Resp't.'s Br. at 26.  He contends that it is likely
that one of the other two men who the "mob" sought to confront --
David or Rigoberto -- was responsible for the shootings.  This
argument, however, ignores the statements by Sevillano, who
definitively identified *Crotte* as the shooter.  See Doc. Evid.,
Ex. 6 at 23; id., Ex. 12 at 49.  Despite Sevillano's definitive
identification of Crotte as the shooter in his written
statements, Crotte cites the following summary of Sevillano's
statement contained in the arrest warrant to support his argument
that several individuals, and not simply Crotte, were discharging
firearms in the direction of the mob:

> David, Rigoberto and Aldo came out and when *they* were
> shooting he felt his right arm wounded, as well as his
> chest underneath the left nipple, . . .

Resp't.'s Br. at 26, citing Doc. Evid., Ex. 14 at 94 (emphasis
added).  Crotte overlooks the fact that the very excerpt from the
arrest warrant on which he relies continues as follows:  "so when
they felt himself injured, he fell to the ground while walking
backwards, *so ALDO shot DANY and the deponent* when they were
walking back . . . ."  Doc. Evid., Ex. 14 at 94 (emphasis
added).[15]

---

[15]Likewise, only a few lines before the snippet from the arrest
warrant quoted by Crotte, the following appears:

> DANY and the deponent were walking towards the corner of
> Calle La Milpa, and DAVID and RIGOBERTO were left behind,
> but when they were outside the place where ALDO lives, they
> started shouting "come out mother fuckers to give you some
> shit," and after the yelling, *ALDO came out, and he saw the
> gun again, which was the same with which he had shot them,
> when he came out he shot at DANY and the deponent*, . . . ."

07mj0177

1      Moreover, irrespective of the summary of Sevillano's

2 statement contained in the arrest warrant, Sevillano's *actual*

3 statements unequivocally identify Crotte as the shooter (see Doc.

4 Evid., Ex. 6 at 23 & Ex. 12 at 49).  Additionally, Jose Antonio

5 Nava Valadez, who was part of Sevillano and Sandoval's group on

6 the evening in question, described under oath that "a guy" (i.e.,

7 a *single* person) was responsible for Sandoval's shooting.  Doc.

8 Evid., Ex. 2 at 9.[16]  There is simply no evidence which supports

9 Crotte's argument that David or Rigoberto committed the shooting

10 or that all three (Crotte, David and Rigoberto) came out

11 shooting.

12      Crotte also speculates that it is possible that one of the

13 "mob's" members was responsible for the shootings as a result of

14 "friendly fire."  Resp't.'s Br. at 26.  The Court does agree with

15 Crotte that there is ample evidence that members of the "mob"

16 were carrying weapons of their own, including guns.  See Cuevas

17 Statement, Doc. Evid., Ex. 5 at 18; Salvador Gonzalez Gonzalez

18 Statement, Doc. Evid., Ex. 10 at 41; Becerra Statement, Doc.

19 Evid., Ex. 13 at 60; Vicente Gonzalez Cuevas Statement, Doc.

20 Evid., Ex. 13 at 61; see also Doc. Evid., Ex. 13 at 57-58

21 (describing positive findings by chemistry experts of gunshot

22 residue on hands of Jose Antonio Nava Valadez and Cain Juan

23 Eduardo Villanueva Alvarez, who were part of Sevillano's group).

24

25 Doc. Evid., Ex. 14 at 93-94 (emphasis added); see also id. at 92 "RIGO
and DAVID came out as well as *ALDO OMAR CROTTE, who was holding a gun*

26 *in his hand, shooting at DANIEL and the deponent*" (emphasis added).

27    [16]According to the Public Prosecutor, Rogelio Rios Martinez also
stated that while he saw three members of Los Tejones come out of the

28 house, "he saw that *one* of them had a gun revolver like using it to
shoot two times at Dany and Julio Cesar . . . ."  Doc. Evid., Ex. 13
at 63-64 (emphasis added).

1  However, none of this evidence is sufficient to negate

2  Sevillano's definitive statements that Crotte shot him and

3  Sandoval.  And, although the Court acknowledges that this

4  evidence contradicts Sevillano's statement that he and his

5  friends were not carrying any weapons of any kind (see Doc.

6  Evid., Ex. 12 at 49), this, too, is not enough to negate his

7  identification of Crotte as the shooter.  The impact, if any,

8  that the above statements may have on Sevillano's credibility can

9  be determined once the case is prosecuted in Mexico.  See Bovio

10 v. United States, 989 F.2d 255, 259 (7th Cir. 1993) (stating that

11 extraditee has no right to attack the credibility of witnesses at

12 an extradition hearing, as issues of credibility are to be

13 determined at trial).  In short, even though Sevillano's

14 statements are contradicted in part by other witness statements,

15 they still constitute competent evidence of probable cause.  See

16 Fernandez v. Phillips, 268 U.S. 311, 312 ("Competent evidence to

17 establish reasonable grounds is not necessarily evidence

18 competent to convict.").

19      Crotte also takes issue with the ballistics evidence

20 contained in the documentary evidence.  Resp't.'s Br. at 26 n.23.

21 The bullet extracted from Sandoval's body was found to correspond

22 to a ".22 caliber (Long-Rifle) lead bullet."  Doc. Evid., Ex. 12

23 at 59.  Crotte appears to contend that such a bullet could not

24 come from the type of weapon Crotte was alleged to have used,

25 i.e., a revolver.  Resp't.'s Br. at 26 n.23.  Crotte is mistaken.

26 The ballistics report itself says that it was not possible to

27 determine from what kind of gun the bullet came.  Doc. Evid., Ex.

28 12 at 59.  Thus, the ballistics report describes only the

1    ammunition used, not the weapon from which it was fired.

2    Additionally, "various rifles, pistols, revolvers, and . . .

3    shotguns" have been manufactured in the .22 Long Rifle caliber.

4    See Wikipedia, entry on ".22 long rifle"

5    (http://en.wikipedia.org/wiki/.22_long_rifle) (accessed Jan. 23,

6    2008).  Thus, it appears that a .22 Long Rifle bullet could be

7    fired from a revolver or handgun.  Therefore, the findings in the

8    ballistics report do not contradict either Sevillano's statements

9    or the Court's probable cause determination.

10         Crotte also observes that none of the persons he describes

11   as percipient witnesses (i.e., those witnesses who were not a

12   part of Sevillano's and Sandoval's group) saw Crotte possess or

13   use a firearm during the events that transpired, despite the fact

14   that several of the witnesses had a "clear and unobstructed view"

15   or "saw the scene from an elevated vantage point."  Resp't.'s Br.

16   at 27.  Although Crotte does not identify the percipient

17   witnesses to whom he is referring by name, the Court presumes

18   that he is referring to Salvador Gonzalez Gonzalez, who said he

19   could "clearly see to the street" from his window, and Vicente

20   Gonzalez Cuevas, who was located in the upper floor of his house

21   at the time of the incident.  Doc. Evid., Ex. 10 at 40–41.

22   Salvador Gonzalez acknowledged in this statement, however, that

23   he "ignore[d] where Aldo had gone."  Id. at 41.  And, although

24   Salvador Gonzalez noted that Crotte came running into his house

25   after he heard a corn popping noise (id.), this sequence of

26   events is not at all inconsistent with Crotte being the shooter.

27   See, e.g., Id., Ex. 2 at 9 (Nava's statement that "when [the] guy

28   stopped shooting, he went back into his house, so then we saw my

friend Daniel lying on the ground"). Additionally, the statement
by Vicente Gonzalez contained in the documentary evidence is in
summary form only and is very sparse -- indeed, it does not
mention Crotte at all. Therefore, this argument has no merit.

Crotte further points out various inconsistencies and
conflicts within several witness statements and contends that the
statements cannot support a finding of probable cause. Resp't.'s
Br. at 27-28. In particular, Crotte identifies inconsistencies
in the statements given by Sevillano (Doc. Evid., Exs. 6 and 12),
Nava (id., Ex. 2 and Ex. 13 at 61) and Rios (id., Ex. 13 at 53 &
64). Crotte contends that these witnesses have a motive to lie
given their own criminal culpability, as witnesses identified
them as the aggressors in the subject incident. Resp't.'s Br. at
28. The Court has reviewed the alleged inconsistencies and
acknowledges that not all of the statements are identical.
Indeed, the inconsistencies demonstrate that the exact sequence
of events on the night of June 26, 1999 is in question. However,
the inconsistencies are not sufficient to negate the showing of
probable cause. Instead, Crotte's contentions raise issues which
are appropriate for determination at a full trial in Mexico.
"The decisions are emphatic that the extraditee cannot be allowed
to turn the extradition hearing into a full trial on the merits."
Matter of Sindona, 450 F.Supp. 672, 685 (S.D.N.Y. 1978);
see also Quinn, 783 F.2d at 815 ("The magistrate [judge] does not
weigh conflicting evidence and make factual determinations but,
rather, determines only whether there is competent evidence to
support the belief that the accused has committed the charged
offense.").

07mj0177

1   Crotte further notes that although the statements of Rogelio
2   Rios Martinez, Magdalena Abundis Ortega, and Oscar Eduardo
3   Sandoval Abundis are set forth in the request for the issuance of
4   the arrest warrant (Ex. 13) and the arrest warrant (Ex. 14), no
5   sworn, written complaints were produced for these witnesses.
6   Crotte likewise contends that the request for the issuance of the
7   arrest warrant relied upon unsworn medical reports and unsworn
8   investigative reports by the Public Prosecutor.  Resp't.'s Br. at
9   29.  The Treaty, however, does not contain an oath requirement.
10  Compare Extradition of Platko, 213 F.Supp.2d 1229, 1238 (S.D.
11  Cal. 2002) (interpreting U.S. treaty with Czechoslovakia as
12  requiring all statements offered in support of arrest warrant to
13  be made under oath).  Because the above evidence was
14  authenticated, it is admissible in this proceeding and it is
15  wholly proper for the Court to consider it in its probable cause
16  determination.  Emami, 834 F.2d at 1451.  Moreover, an
17  extradition proceeding is not a trial; to require Mexico to
18  produce all of its evidence would defeat the whole object of
19  extradition.  Therefore, Crotte's arguments with respect to the
20  above evidence are without merit.
21      Finally, Crotte contends that Mexico failed to present
22  exculpatory evidence to the Court.  Resp't.'s Br. at 30-32.
23  Specifically, he states that full and complete sworn, written
24  statements should have been provided for Carmen Becerra Guerrero
25  and Vicente Gonzalez Cuevas, not just summaries of their
26  statements (see Ex. 13 at 60-61).  Crotte, however, cites only
27  non-extradition authorities to support his argument.  In
28  extradition cases, there is no requirement that exculpatory

07mj0177

1  evidence be produced.  Caplan, 649 F.2d at 1342 n.10 ("the

2  accused has no right to introduce exculpatory evidence and the

3  government has no duty to do so," citing Charlton v. Kelly, 229

4  U.S. 447, 456 (1913)).  Thus, this argument fails.

5       After thoroughly considering all of the foregoing arguments

6  and evidence, the Court finds the evidence submitted by Mexico,

7  through the Government, sufficient to support a finding of

8  probable cause with respect to the charge of homicide.[17]

9  C.   Crotte's Other Contentions

10       1.   Sixth Amendment Argument

11       Crotte contends that there has been an impermissible post-

12  indictment delay under the Sixth Amendment because the Mexican

13  government did not file its formal request for extradition until

14  March 23, 2007, more than seven years after the issuance of the

15  November 1999 arrest warrant.  Resp't.'s Br. at 24-25.  Case

16  authority makes it clear, however, that there is no Sixth

17  Amendment right to a speedy trial in extradition cases.  See,

18  e.g., Sabatier v. Dabrowski, 586 F.2d 866, 869 (1st Cir. 1978);

19  Jhirad II, 536 F.2d at 485 n.9; see also Yapp v. Reno, 26 F.3d

20  1562, 1568 (11th Cir. 1994) (finding lapse of time provision in

21  extradition treaty to refer to the running of a statute of

22  limitations and not to a defendant's Sixth Amendment right to a

23  speedy trial).  Accordingly, the Court finds this argument to be

24  without merit.

25  //

26

27       [17]The evidence discussed above also supports a finding of probable
   caus as to the battery charge, but as discussed above in Section
28  III.A.1.a.ii., supra, the applicable Mexican statute of limitations
   has run on that charge.

2.   <u>Due Process Argument</u>

Crotte argues that his extradition to Mexico would violate the Due Process Clause of the Constitution because Mexico has "presumed Mr. Crotte's guilt."  Resp't.'s Br. at 32-33.  The Government counters that U.S. constitutional protections do not apply in an extradition hearing and that questions concerning the judicial procedure in the requesting state are not proper matters for consideration by the court in the United States.  Gov't.'s Br. at 19.  The Court agrees.  As the Supreme Court stated, "We are bound by the existence of an extradition treaty to assume that the trial will be fair."  <u>Glucksman v. Henkel</u>, 221 U.S. 508, 512 (1911).  Additionally, the Ninth Circuit has stated the following with respect to the rule of non-inquiry:

> [A]n extradition magistrate lacks discretion to inquire into the conditions that might await a fugitive upon return to the requesting country.  [Citation omitted.] The extradition magistrate's authority has been constrained by statute and caselaw to a narrow inquiry, such that the magistrate judge does not have any discretion to exercise.  Once the magistrate judge determines that the crime is extraditable and there is probable cause to sustain the charge, it is the Secretary of State, representing the executive branch, who determines whether to surrender the fugitive. [Quotations and citation omitted.]

<u>Prasoprat</u>, 421 F.3d at 1016; <u>see</u> <u>also</u> <u>Holmes v. Laird</u>, 459 F.2d 1211, 1219 (D.C. Cir. 1972) ("a surrender of an American citizen required by treaty for purposes of a foreign criminal proceeding is unimpaired by an absence in the foreign judicial system of safeguards in all respects equivalent to those constitutionally enjoined upon American trials").

3.   <u>*Parretti*/Fourth Amendment Argument</u>

Crotte contends that the request for the issuance of the

41

07mj0177

1  arrest warrant in Mexico (Doc. Evid., Ex. 13) and the Mexican

2  arrest warrant itself (id., Ex. 14) were based on unsworn

3  allegations that do not satisfy the Fourth Amendment or the

4  Treaty. Resp't.'s Br. at 33-37. Crotte relies upon Parretti v.

5  United States, 122 F.3d 758 (9th Cir. 1997) (withdrawn on

6  rehearing by Parretti v. United States, 143 F.3d 508 (9th Cir.

7  1998)) in support of his argument. The Court agrees with the

8  Government, however, that Crotte's reliance upon Parretti is

9  misplaced. In Parretti, a three judge panel of the Ninth Circuit

10 held that the issuance of a provisional arrest warrant could not

11 rest solely on the existence of a foreign arrest warrant; rather,

12 it must be supported by competent evidence of probable cause.

13 Parretti, 122 F.3d at 773. There, the sole basis for the

14 allegations in the U.S. Attorney's complaint for provisional

15 arrest was the existence of a French arrest warrant. The warrant

16 itself was not attached to the complaint, nor were any other

17 affidavits or competent evidence. Id. at 761. Here, Mexico,

18 through the Government, has provided the actual arrest warrant as

19 well other documentary evidence, including witness statements and

20 Ministerial Attestations, and thus has presented much more to

21 support its request for extradition than just the *existence* of an

22 arrest warrant, as was the case in Parretti. As discussed above,

23 sufficient competent evidence has been provided to permit this

24 Court to independently find that probable cause exists to believe

25 that Crotte committed the offenses charged. Thus, Parretti is

26 distinguishable.[18]

27

28    [18]Additionally, as noted above, the panel opinion in Parretti was
   withdrawn and the appeal dismissed by an en banc panel of the Ninth
   Circuit. See Parretti v. United States, 143 F.3d 508 (9th Cir. 1998)

07mj0177

1   Crotte's related argument that unsworn allegations cannot be
2   relied upon to demonstrate probable cause has already been
3   addressed by the Court.   The admissibility of evidence in
4   extradition proceedings is governed by the standards set forth
5   above.   <u>See</u> Section III.B.1., *supra*.   In particular, because the
6   Treaty does not have an oath requirement, both sworn and unsworn
7   statements contained in properly authenticated documents are
8   permissible.   <u>Artukovic</u>, 784 F.2d at 1356; <u>see</u> <u>also</u> <u>Zanazanian</u>,
9   729 F.2d at 627 ("Neither the applicable treaty nor United States
10  law requires that evidence offered for extradition purposes be
11  made under oath.")[19]

12  Therefore, Crotte's Fourth Amendment and <u>Parretti</u> arguments
13  are without merit.

14  D.   <u>Motion to Strike Testimony of Ruben Gonzalez</u>

15  At the conclusion of the proceedings held before this Court
16  on September 26, 2007, the Court expressed its desire to ask Mr.
17  Gonzalez a few questions regarding Mexican legal procedure.   Tr.,
18  54:19-21.   Earlier in the hearing, the Government had made clear
19  that Mr. Gonzalez was not being proffered as an expert witness
20  and that he was available simply in case there were any further
21  questions from the Court.   <u>Id.</u>, 5:12-16.   Although the Government
22  stated that it did not object to the Court asking questions of
23  Mr. Gonzalez at the hearing (<u>id.</u>, 55:22-56:1), it now belatedly
24  seeks to strike his testimony.   In light of the Government's
25  explicit statement at the extradition hearing that it had no

26  _____

27  (en banc).

28  [19]Most of the statements in this case were, in any event, either
sworn or under penalty of perjury.

07mj0177

1  objection to Mr. Gonzalez answering the Court's questions, and in
2  view of the fact that it was understood by the parties and the
3  Court that Mr. Gonzalez was not testifying as an expert, the
4  Court **DENIES** the Government's motion to strike.

5                                **IV.**

6                             **Conclusion**

7       Based on the foregoing, the Court finds that Mexico, through
8  the Government, has provided all of the necessary information
9  required by the Treaty to succeed in its request for the
10 extradition of Aldo Omar Crotte Sainez on the charge of homicide
11 of Daniel Sandoval Abundis.  Therefore, the Court **GRANTS** the
12 request for extradition with respect to this charged crime.

13      Prosecution of the battery charge is barred by the statute
14 of limitations under Mexican law.  Consequently, Crotte cannot be
15 extradited to Mexico for prosecution of the charge of battery of
16 Julio Cesar Sevillano Gonzalez.  The Court **DENIES** the request for
17 extradition with respect to this offense.

18      The extradition request and the supporting documents
19 admitted into evidence during the hearing are properly certified
20 and authenticated or otherwise admissible within the discretion
21 of the Court.  Accordingly, the Court will certify the above
22 findings, and all documents admitted into evidence, to the
23 Secretary of State, pursuant to 18 U.S.C. § 3184.

24      **IT IS SO ORDERED**.

25 DATED:  February 8, 2008

26                          _____
                            Jan M. Adler
27                          U.S. Magistrate Judge

28